RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0181p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

     *v.*

RUDOLPH V. JACKSON,
          *Defendant-Appellant.*

No. 11-3688

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:10-cr-407-1—Dan A. Polster, District Judge.

Argued: June 8, 2012

Decided and Filed: June 19, 2012

Before: MOORE, ROGERS, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Wendi L. Overmyer, FEDERAL PUBLIC DEFENDER'S OFFICE, Akron, Ohio, for Appellant. Daniel R. Hurley, ASSISTANT UNITED STATES ATTORNEY, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Wendi L. Overmyer, FEDERAL PUBLIC DEFENDER'S OFFICE, Akron, Ohio, for Appellant. Daniel R. Hurley, ASSISTANT UNITED STATES ATTORNEY, Ann Arbor, Michigan, for Appellee.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge. Defendant Rudolph Jackson conditionally pled guilty to the charge of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), reserving the right to appeal the district court's denial of his motion to suppress the firearm discovered in the vehicle he was driving. On appeal, he

1

challenges the legality of the traffic stop and inventory search of the vehicle that led to his arrest. For the reasons that follow, we affirm.

I.

During a roll call meeting on the afternoon of August 17, 2010, supervisors at the Akron, Ohio, Police Department ("APD") issued a "BOLO" (be on the lookout) alert for a suspect involved in a recent nightclub shooting. The suspect was thought to be driving a black Chevrolet Tahoe with yellow stripes and chrome wheels. Almost immediately after starting his afternoon shift in a marked patrol car, APD Officer Troy Meech, who was familiar with the suspect, spotted a vehicle that resembled the Tahoe. It was traveling in the opposite direction on Rhodes Avenue, a two-lane residential street. The yellow stripes and the chrome wheels on the SUV caught Officer Meech's attention. As soon as it passed by him, Officer Meech looked in his rear-view mirror and saw the brake lights come on, "as if [the driver] was waiting to see what [Meech] was going to do." Meech turned around and followed the SUV while attempting to read a temporary license tag on the back of it. As he did so, the driver made a quick left turn into the driveway of a house at 83 Rhodes Avenue without using a turn signal. After observing this traffic infraction, Officer Meech activated his lights and siren and performed a traffic stop. He radioed the vehicle's license number to APD dispatch and exited his patrol car.

As Officer Meech approached the vehicle, the driver, later identified as defendant Jackson, opened his door. Officer Meech saw that Jackson and his passenger, Kenard Gay, were each holding open, partially consumed bottles of Heineken beer as they sat in the vehicle. Officer Meech asked Jackson whether he had a valid driver's license. Jackson responded that he did not.

Officer Meech testified at the suppression hearing that once he saw Jackson sitting in the SUV, he realized that neither Jackson nor the vehicle had any connection with the incident that precipitated the BOLO alert. The vehicle was a dark blue and

yellow GMC Yukon, an SUV very similar in style and design to the Chevy Tahoe.[1] Officer Meech nonetheless removed Jackson from the vehicle and placed him under arrest for having an open container of an alcoholic beverage in a motor vehicle. He then conducted a background check on both Jackson and Gay. APD dispatch reported that Jackson not only had a suspended license, but also an outstanding warrant for his arrest. Gay, too, had a suspended license.

Officer Meech determined that in accordance with APD's Vehicle Impoundment and Inventory Procedure Policy ("the APD Policy"), the Yukon would have to be towed from the scene because it was illegally parked in the driveway of a residence with no discernible connection to either Jackson or Gay,[2] and neither Jackson nor Gay could drive it to another location in light of their consumption of alcohol and suspended licenses.

Before releasing the vehicle to the towing company, Officer Meech performed an on-site inventory search of the interior and exterior of the Yukon, pursuant to the APD Policy. Inside the vehicle was a six-pack of Heineken beer with two opened bottles. While checking under the driver's seat, Officer Meech noticed that "part of the carpet on the floor board had been ripped up and just appeared to be like loose as if someone could have put something underneath there. I went to lift it up and noticed there was [a] loaded .380 Cobra handgun on the floor of the car." He further explained:

> Where the emergency brake pedal is and the brake pedal, the carpet that goes underneath that, you know how they kind of fold it over, and I mean it looks like it's supposed to look. That was tor[n] up and the carpet was like pushed up against it so the extra carpet was just up against the – under the dash there. It was obvious it had been tor[n] up.

---

[1]Subsequent to Jackson's arrest, authorities determined that Jackson's fiancée purchased the vehicle on the morning of August 17, 2010, and placed a thirty-day license tag on the rear of the vehicle.

[2]The addresses given by Jackson and Gay differed from the Rhodes Avenue address where they stopped, Jackson did not tell Officer Meech that he had permission to park in the driveway or indicate that he knew the homeowners, and there was no contact with the homeowners.

Officer Meech testified that there were no nails or fasteners to remove from this area, and in the process of lifting the carpet, he did not damage it in any way. He "simply checked under [the carpet]" by lifting the loose flap and discovered the loaded firearm. When asked about the gun, Jackson claimed that he did not know it was in the vehicle, stating that he had just purchased the car a couple of weeks ago. Officer Meech informed Jackson that the firearm would be tested for fingerprints and asked him if his fingerprints would be found on it, to which Jackson replied, "they might be." After Jackson's arrest, Officer Meech issued him a traffic citation for driving with a suspended license and failure to use a turn signal.[3] The vehicle was then towed and impounded.

As a result of the traffic stop and discovery of the firearm, Jackson was indicted in federal district court on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Before trial, he moved to suppress the firearm, arguing that the traffic stop and inventory search were illegal. The district court conducted an evidentiary hearing, at which Officer Meech was the lone witness. The court found that because there was no indication in the record that the BOLO information came from a credible source, it would not rely upon Officer Meech's suspicion of criminal activity as a lawful basis for the stop. The district court held, however, that the traffic violation of failure to signal, albeit "a minor one," provided an independent basis to justify the stop. The court also determined that there were three legitimate grounds for Jackson's arrest – the open container violation, driving with a suspended license, and the outstanding arrest warrant. The court further found that it was necessary for the APD to tow the Yukon because Jackson and Gay had suspended licenses and had consumed alcohol, and because the Yukon was illegally parked in someone else's driveway. Finally, the court held that Officer Meech's inventory search did not exceed the bounds of a reasonable search under the Fourth Amendment. It therefore denied Jackson's motion to suppress.

Jackson subsequently pled guilty to the charge but reserved his right to appeal the denial of his suppression motion. The district court imposed a below-Guidelines

---

[3]Gay was ticketed for an open-container violation and released at the scene.

sentence of forty-eight months of imprisonment, followed by three years of supervised release.  Jackson timely appeals, challenging the district court's decision denying his motion to suppress.

II.

When reviewing the district court's ruling on a motion to suppress, we review findings of fact for clear error and legal conclusions de novo.  *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007).  "When the district court has denied the motion to suppress, we review all evidence in a light most favorable to the Government."  *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (citation and internal quotation marks omitted).

Jackson first challenges the legality of the traffic stop, arguing that the stop was in reality based upon Officer Meech's unreasonable suspicion, originating from the unreliable BOLO alert, that he was involved in criminal activity.  We disagree.

"An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment.  Accordingly, any evidence seized during an illegal traffic stop must be suppressed as fruits of the poisonous tree."  *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citations and internal quotation marks omitted).  It is well established that a police officer lawfully may stop a car when he has probable cause to believe that a civil traffic violation has occurred, or reasonable suspicion of an ongoing crime.  *Id*. at 748; *see also United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) ("[T]here is nothing unreasonable about stopping a vehicle whose driver has just committed a traffic violation.") (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).  The fact that a traffic violation is not an arrestable offense does not divest the police of authority to stop the vehicle.  *Street*, 614 F.3d at 232 (upholding the legality of a traffic stop made for a seatbelt violation); *United States v. Anderson*, 458 F. App'x 440, 442 (6th Cir. 2012) (holding that a license-plate violation provided probable cause to make a traffic stop).

A driver's failure to use a turn signal provides probable cause to justify a traffic stop irrespective of the officer's subjective intent. *See Whren*, 517 U.S. at 819 (holding that vehicle was properly stopped for, inter alia, failure to signal in violation of a District of Columbia traffic code); *United States v. Ware*, No. 09-4419, 2012 WL 695452, at *5 (6th Cir. Mar. 1, 2012) (unpublished) ("[T]he district court determined that the detectives had probable cause to stop the car when Ware committed a traffic violation by turning right without using a turn signal. Because probable cause existed for the traffic stop, the district court correctly held that the officers' subjective or pretextual motivation for making the stop was not relevant under *Whren*[.]"); *United States v. Miller*, 413 F. App'x 841, 843 (6th Cir. 2011) ("[E]ven if [the officer] used the failure to signal as a pretext to initiate a traffic stop of an otherwise-suspicious vehicle, this fact does not undermine the probable cause that existed to make the stop if [the defendant] failed to signal his turn."); *United States v. Akram*, 165 F.3d 452, 455 (6th Cir. 1999) ("[The officer] had probable cause to stop the truck because it failed to signal before changing lanes, in violation of Ohio law.").

Here, as the district court properly held, regardless of whether Officer Meech had reasonable suspicion to stop Jackson's vehicle based on its similarity to the BOLO suspect's vehicle, the traffic stop was nonetheless constitutional because Officer Meech observed Jackson making a left turn without activating his turn signal, in violation of Ohio law and Akron ordinances. *See* O.R.C. 4511.39(A); Akron, OH, Code of Ordinances, title VII, ch. 72, art. 1, § 72.15. Jackson's Fourth Amendment rights were not implicated by Officer Meech's decision to follow the Yukon because it matched the BOLO description. Officer Meech did not effectuate a seizure until he activated the lights and siren of the patrol car, which did not occur until after Jackson made the illegal left turn into the driveway. At that point, Meech had an adequate legal basis to detain Jackson to investigate the infraction. *United States v. Hill*, 195 F.3d 258, 269 (6th Cir. 1999). The district court found Officer Meech's uncontradicted testimony in this regard to be credible, a conclusion entitled to deference on appeal. *United States v. McCauley*, 548 F.3d 440, 447 (6th Cir. 2008). We find no error in the district court's determination that the traffic stop was lawful.

To the extent Jackson challenges his arrest, his argument is meritless.   He contends that once Officer Meech realized that he was not the BOLO suspect, the traffic stop should have ended.   However, he admits that Officer Meech's observation of him with an open container of beer in hand "complicates matters."    This is an understatement.   There existed not one, but three, independent bases to arrest Jackson: his possession of an opened alcoholic beverage while operating a motor vehicle, in violation of O.R.C. § 4301.62(B)(4); his driving with a suspended license; and the existence of an active warrant for his arrest.   *See, e.g.*, *United States v. Murphy*, 278 F. App'x 577, 581 (6th Cir. 2008) ("[The deputy] . . . had probable cause to arrest [the defendant], having discovered after the lawful stop of the vehicle that [the defendant] smelled of alcohol, had an open container of alcohol in plain view on the truck's console and more beer in a sack inside the truck, and had neither a valid driver's license nor insurance."); *United States v. Black*, 240 F. App'x 95, 101-02 (6th Cir. 2007) ("The officers . . . had probable cause to arrest [the defendant] for driving while intoxicated, possessing an open alcoholic beverage container in an automobile, and driving with a suspended license.").

Jackson further contends that Officer Meech's decision to tow the vehicle from the scene was unreasonable under the circumstances.   He points out that (1) the APD Policy informs officers that "having the authority to tow does not mean having the need to tow," (2) in some circumstances, the Policy allows improperly licensed drivers to drive away in their vehicles after receiving a citation, and (3) the Akron Code of Ordinances allows a vehicle to remain on private property with permission of the property owner.   (Akron Code of Ord. § 70.50(B), at A-9).   Jackson maintains that Officer Meech failed to follow the ordinance and APD Policy by ordering that the Yukon be towed without first contacting the Rhodes Avenue homeowner or the owner of the Yukon (Jackson's fiancée).   However, we rejected a similar argument in *United States v. Kimes*, 246 F.3d 800 (6th Cir. 2001), stating:

> Discretion as to impoundment is permissible "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity."   *Colorado v.*

*Bertine*, 479 U.S. 367, 375–376, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). Here, as we gather, V.A. police sometimes permitted vehicles to be picked up by a driver's friends and relations if they were already present or if the driver could contact them and get them to come to the facility promptly. Mr. Kimes suggests that rather than towing his truck, the officers should have taken it upon themselves to call his wife and ask her to get the vehicle. He cites no authority compelling such a conclusion, and we are aware of none.

*Id*. at 805. *See also United States v. Pryor*, 174 F. App'x 317, 320 (6th Cir. 2006) (holding that the impoundment of the defendant's vehicle was valid under standard police procedure where the car was parked on private property at an apartment complex, the defendant did not live there, he could not obtain permission from the property owner because the manager's office was closed, and he could not turn the keys over to his wife because she did not appear on the scene until after the police had concluded the inventory search).

Jackson and Gay were not lawful drivers, and neither man had a known connection to the owners of the private residence at 83 Rhodes Avenue, leaving no reasonable alternative but to tow the Yukon. Officer Meech's action conformed to the APD Policy, which provides that "[t]he owner may allow a *properly licensed driver* to drive or secure his vehicle in a legal parking spot. . . . If this is not possible, *the officer should tow if the operator has . . .* [*a*] *suspended license*, properly verified by the officer." (Emphasis added.) In addition, the Akron Code of Ordinances provides that police officers are authorized to remove and impound a vehicle when any vehicle "is left on private property without the permission of the person having the right to the possession of the property," or "is left unattended due to the removal of an ill, injured or arrested operator," or "has been operated by any person who is driving without a lawful license or while his license has been suspended or revoked." Akron Code of Ord. § 70.50(B), (G), and (I). As the district court recognized, it was simply not an option to allow Jackson or Gay to drive the vehicle from the scene.

Next, Jackson argues that Officer Meech's inventory search was unconstitutional. Jackson seeks to distinguish a vehicle's floor carpeting from a glove compartment,

container, or floor mat, arguing that it is a fixture that is out of the bounds of a reasonable inventory search.  He contends that the mere fact that an older vehicle may have worn or damaged carpeting – particularly in an area with above-normal wear and tear – does not justify exploration under the carpet.  The search, however, in these particular circumstances did not violate the Fourth Amendment.

It is settled law that the police may conduct an inventory search of an automobile that is being impounded without running afoul of the Fourth Amendment.  *United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007).  "In order to be deemed valid, an inventory search may not be undertaken for purposes of investigation, and it must be conducted according to standard police procedures."  *Id*. at 651 (citation and internal quotation marks omitted).  A general written inventory policy does not grant officers carte blanche when conducting a search; rather, it must be sufficiently tailored to only produce an inventory.  *Tackett*, 486 F.3d at 232.  Thus, "[i]n conducting an inventory search, officers do not enjoy their accustomed discretion; they simply follow the applicable policy."  *Id.*  "Nonetheless, officers may exercise some judgment based on concerns related to the purposes of an inventory search; for example, they may decide to open particular containers if they cannot determine the contents."  *Id*. (citation and internal quotation marks omitted).  "When a legitimate search is underway, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand."  *Colorado v. Bertine*, 479 U.S. 367, 375 (1987) (citation and internal quotation marks omitted).

Officer Meech's testimony at the suppression hearing establishes that he acted within the parameters of the APD Policy, which provides that an inventory search shall be conducted in the following manner:

> a.      Inventory all interior and exterior areas of an impounded vehicle utilizing the checklist on the report.  If possible, locked vehicle doors should be opened and the inside of the vehicle inventoried.

> If the trunk or glove compartment is locked, do not open it unless the key is readily available.

b.   Packages, suitcases, or other unlocked containers within the vehicle will be opened and inventoried.  If the key is readily available for any locked container, or the locked container can be opened by other means without causing damage to the container, it will be opened and inventoried.

c.   Intrusion into locked containers or secured areas that cannot be opened without causing damage shall be made only after receiving permission from the owner or obtaining a search warrant.

The Policy clearly authorizes a search of "all interior . . . areas."  If Officer Meech had "ripped up" the carpet, as Jackson asserts, his actions might give us pause.  However, that did not occur in this case.  Officer Meech testified that the carpet was already "ripped up" – the very feature that drew his attention to it.  He was clear in his testimony that he simply lifted the already loose flap of carpet that appeared to have been tampered with, based on his reasonable belief that it might be concealing a hiding place for items.  The district court credited his testimony and further noted that Officer Meech did not search under all of the vehicle's carpeting, but just the portion that appeared to have been disturbed.  The district court did not err in concluding that the inventory search was constitutional.

In *United States v. Edwards*, 577 F.2d 883 (5th Cir. 1978), the Fifth Circuit Court of Appeals affirmed the constitutionality of an inventory search involving nearly identical circumstances:

> While searching the floor region near the power seat lever between the driver's seat and the door, officer Williams noticed that two separate parts of the carpet overlapped, concealing an area where property could be secreted.  The officer then lifted the loose "carpet flap", revealing the envelopes containing the stolen checks.  We conclude that such action by the officer was reasonable under the circumstances of this case.  We emphasize that the officer merely lifted the loose flap and did not remove any nails or fasteners, or in any other way separate the carpet from the floor of the automobile.  Additionally, a short time earlier the officer had observed the defendant make a suspicious move toward the floor of the automobile.  The officer could reasonably conclude that property may

have been concealed beneath the carpet flap. He may have been in dereliction of duty had he not searched such an obvious place of concealment.

*Id*. at 894.

The Fifth Circuit emphasized that "we do not in any way condone searching under the carpeting in every case, much less the ripping apart of an automobile, or any part thereof, under the guise of an inventory search. The intrusion in each case must be limited in scope to the private and public interests which underlie the inventory." *Id*. at 895. We agree with the court's view that "in conducting an inventory search pursuant to standard police practice, an officer may search those places within an automobile where, under the facts of the particular case, he can reasonably conclude that personal property may be located." *Id*. And, as in *Edwards*, Officer Meech's inventory search was conducted consistent with Jackson's Fourth Amendment rights and the APD Policy.

III.

For the reasons set forth above, we affirm the judgment of the district court.